UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GEORGE WILLIAMS, AS DISTRIBUTEE OF
THE ESTATE OF SHAWN TODD,

                                    Plaintiff,

                    v.

A TEAM SECURITY, INC.,

                                    Defendant.

**MEMORANDUM AND ORDER**

20-CV-1568 (LDH) (VMS)

LASHANN DEARCY HALL, United States District Judge:

Shawn Todd ("Plaintiff") brings this action against A Team Security, Inc. ("Defendant"),

asserting a claim for retaliation under Title VII of the Civil Rights Act ("Title VII"), and claims

for hostile work environment and retaliation under the New York City Human Rights Law

("NYCHRL").  Defendant moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for

summary judgment on Plaintiff's retaliation claims.

## UNDISPUTED FACTS[1]

Defendant is a security company that provides services for a complex of 26 commercial

buildings in downtown Brooklyn, New York called Industry City or, alternatively, Bush

Terminal ("Industry City").  (Plaintiff's Opp'n to Def.'s 56.1 Statement ("Pl.'s Opp'n 56.1") ¶ 1,

ECF No. 34.)  Defendant contracts with Industry City to provide security, fire, and safety

---

[1] Unless otherwise indicated, the undisputed facts are taken from the parties' statements of material facts and
annexed exhibits pursuant to Local Rule 56.1.  To the extent any fact is disputed, it is so indicated.  Facts that are not
contradicted by citations to admissible evidence are deemed admitted.  *See Giannullo v. City of N.Y.*, 322 F.3d 139,
140 (2d Cir. 2003) ("[I]f the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1
statement, that fact will be deemed admitted.").  Further, the Court does not consider arguments and legal
conclusions contained in the parties' 56.1 statements.  *See, e.g., Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL
459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("Rule 56.1 statements are not argument. They should contain factual
assertions, with citation to the record. They should not contain conclusions[.]" (emphasis omitted)), *aff'd*, 56 F.
App'x 27 (2d Cir. 2003).

services to the complex.  (*Id.* ¶ 4.)  A critical part of Defendant's provision of services includes reviewing footage from Industry City's 400 surveillance cameras.  (*Id.* ¶¶ 5, 6.)

### I.    The May 26, 2019 Incident

Plaintiff, now deceased, was hired by Defendant as a security officer on March 26, 2015. (*Id.* ¶ 13.)  Some time before December 31, 2018, Plaintiff was promoted from security officer to security/patrol supervisor.  (*Id.* ¶ 16.)  In this role, Plaintiff's duties included patrolling the Industry City complex, checking on security officers at their posts, and interacting with local police and fire departments as necessary.  (*Id.* ¶ 17.)

Diamond Palmer-Windley also worked at Industry City, as a dispatcher.  (*Id.* ¶ 22.)  In that role, she was responsible for watching security cameras, answering phone calls, and dispatching security staff as needed.  (*Id.* ¶¶ 22–23.)  The parties agree that Palmer-Windley had no ability to fire, promote, or demote Plaintiff, and had no power to change his pay rate.  (*Id.* ¶ 35.)  While Plaintiff initially enjoyed a friendly and professional relationship with Palmer-Windley, their friendship eventually ended.  (*Id.* ¶¶ 28–31.)  And, from March 2018 through September 2018, Plaintiff issued twelve separate Notices for Improvement against Palmer-Windley for various infractions.  (*Id.* ¶¶ 36–37.)

On or around May 25, 2019, Plaintiff and two co-workers went to Industry City's command center, where Palmer-Windley was stationed.  (*Id.* ¶¶ 40–41.)  Upon entering, Plaintiff noticed that Palmer-Windley, who had been in the bathroom, was absent, and "joke[d] that [Palmer-Windley] had abandoned her post."  (*Id.* ¶¶ 43–45.)  Palmer-Windley quickly came out of the bathroom.  (*Id.* 46.)  Upset and embarrassed, Palmer-Windley asked Plaintiff why he was speaking so loudly that people downstairs could hear.  (*Id.* ¶¶ 46–47.)  Plaintiff told Palmer-

Windley to calm down, to which she responded, "suck my dick," and walked out.  (*Id*. ¶¶ 48–49.)  Palmer-Windley seemed upset when she said this statement.  (*Id.* ¶ 50.)

The next day, on May 26, 2019, Plaintiff crossed paths with Palmer-Windley again as she was leaving the command center to go on break.  (*Id*. ¶¶ 52–53, 56.)  Plaintiff asked Palmer-Windley: "When do we, like, call for breaks [when] our shifts are getting ready to end?"  (*Id*. ¶ 57.)  Palmer-Windley, in a "strong, aggressive tone," told Plaintiff to "get of [her] dick."  (*Id*. ¶¶ 58, 59.)  Minutes later, Plaintiff called security shift supervisor Terrell Bailey, who had been present during the May 25, 2019 incident. (*Id*. ¶¶ 40, 62.)  Plaintiff explained to Bailey that Palmer-Windley had again told him to "get off [her] dick."  (*Id*. ¶ 64.)  Bailey informed Plaintiff that he had just spoken to Joe Jaffe, an assistant director of security, who told Bailey that Palmer-Windley had accused Plaintiff of telling her words to the effect of "suck my dick" or "get off my dick."  (*Id*. ¶ 65.)  Indeed, in an email to Paul Chabot, the director of security at Industry City, Palmer-Windley alleged that Plaintiff had in fact told her to "suck *his* dick" on May 26, 2019.  (*Id*. ¶ 76) (emphasis added.)

On May 27, 2019, Bailey sent an email regarding the May 25 and May 26 incidents to Chabot, Jaffe, and John Serrantino, another assistant director of security.  (*Id*. ¶ 68.)  Serrantino then asked Patrick Matusik, the third individual present in the command center on May 25, 2019, to submit a statement describing what had transpired between Plaintiff and Palmer-Windley.  (*Id*. ¶ 74.)

On June 5, 2019, after meeting separately with Chabot and Serrantino, Plaintiff and Palmer-Windley agreed to meet.  (*Id*. ¶ 79.)  After the meeting, both signed an agreement (the "June 5, 2019 Agreement"), which provided that Plaintiff and Palmer-Windley would refrain from using unprofessional or disrespectful language toward one another while employed with

3

Defendant.  (*Id*. ¶ 80.)  After the June 5, 2019 meeting, Palmer-Windley never made any offensive comments to Plaintiff.  (*Id*. ¶ 88.)  Palmer-Windley resigned her employment with Industry City on November 24, 2019.  (*Id*. ¶ 89.)

On October 10, 2019, Plaintiff filed a Charge with the United States Equal Employment Opportunity Commission ("EEOC").  (*Id*. ¶ 90.)  Plaintiff subsequently filed his initial complaint in this action on March 27, 2020,  (*see* Compl., ECF No. 1), and his amended complaint on October 9, 2020 (*see* Am. Compl., ECF No. 14.)

## II.   Plaintiff's Performance Issues

### A.  Incidents with Santos

Around February 22, 2020, Sergio Santos began working for Defendant as a command center dispatcher.  (Pl.'s Opp'n 56.1 ¶ 95.)  On September 8, 2020, Santos issued Plaintiff two separate Notices for Improvement.  (*Id*. ¶ 101.)  The first Notice for Improvement was issued because Plaintiff was "hanging out" in one of the Industry City buildings for 37 minutes before relieving the security guard on duty for a break on August 24, 2020.  (*Id*.)  The second was issued to Plaintiff for losing his parking lot access card.  (*Id*. ¶ 103.)  Plaintiff signed each of the two Notices for Improvement "under protest," but provided no comments in the "Employee Comments" section.  (*Id*. ¶¶ 102, 104.)

On September 15, 2020, the command center received a report of a water leak in one of the buildings in Industry City.  (*Id*. ¶ 105.)  Santos informed Plaintiff of the leak in one of the buildings and asked Plaintiff to investigate.  (*Id*. ¶¶ 105–109.)  Plaintiff and Santos then proceeded to have a verbal disagreement about whether Plaintiff needed to investigate the leak.  (*Id*. ¶ 112.)  Santos issued Plaintiff a Notice for Improvement regarding the confrontation.  (*Id*. ¶

115.)  Santos was unaware of any complaints Plaintiff made to Defendant regarding Palmer-Windley.  (*Id*. ¶ 100.)

### B.  Incidents with Johnson

In or around July 2020, Defendant hired Robert Johnson to work as a command center supervisor.  (*Id*. ¶ 116.)  On September 23, 2020, Johnson sent an email to Chabot and Matusik indicating that Plaintiff had spoken with a police officer for over thirty minutes regarding a building alarm, but never reported the investigation to the command center.  (*Id*. ¶ 120.)  Johnson issued Plaintiff a Notice for Improvement regarding the police investigation issue and other areas for performance improvement.  (*Id*. ¶¶ 121–122.)  Johnson was never told to monitor Plaintiff and was not aware of Plaintiff's complaints regarding Palmer-Windley.  (*Id*. ¶¶ 117–19.)  Indeed, Johnson did not know who Palmer-Windley was at the time.  (*Id.* ¶ 117.)

Katherine Sarkissian was hired by Defendant as a command center dispatcher.  (*Id*. ¶ 123.)  On September 24, 2020, Sarkissian reported an incident of a woman lying on the ground near one of the buildings in Industry City who ultimately required ambulance assistance.  (*Id*. ¶ 125.)  Thereafter, Sarkissian sent an email to Chabot reporting the incident and advising Chabot that a review of the security footage revealed that Plaintiff and another security supervisor witnessed the woman being dragged out of a car and left on the ground, where she was later found.  (*Id*. ¶ 127.)  Plaintiff did not report the incident.  (*Id*.)  Although the other supervisor with Plaintiff reported the incident to Sarkissian, that supervisor failed to mention the events leading up to the woman being taken by the ambulance.  (*Id*.)  Sarkissian subsequently issued a Notice for Improvement to Plaintiff on September 24, 2020, indicating that he failed to communicate with the command center during the ongoing situation.  (*Id*. ¶ 128.)  Sarkissian issued an identical Notice for Improvement to the other supervisor present.  (*Id*. ¶ 129.)  At the time,

Sarkissian was unaware of Plaintiff's complaints regarding Palmer-Windley as of September 2020.  (*Id*. ¶ 124.)

On or around October 1, 2020, Chabot suspended Plaintiff from either October 2 or 3, 2020, until October 9, 2020.  (*Id*. ¶ 130.)  Chabot informed Defendant's human resources ("HR") department and his supervisor Gal Yaniv of the suspension and wrote that Plaintiff "has become very aggressive towards his superiors while on duty . . . has failed to correct his unprofessional attitude and has become a danger to himself and others by failing to communicate critical information to the Security Command Center."  (*Id*. ¶ 132.)  The same day, Plaintiff requested he be paid out for two days of vacation time.  (*Id*. ¶ 133.)  Then, on October 7, 2020, two days before his suspension was due to end, Plaintiff requested a 30-day leave of absence for a personal emergency.  Defendant approved the request.  (*Id*. ¶¶ 137–38.)

Defendant's employee handbook cautioned that workers who (1) resigned, (2) failed to return from a leave of absence on the date specified by Defendant, or (3) failed to either report to work or call in for three or more consecutive scheduled workdays would have their employment deemed voluntarily terminated.  (*Id*. ¶ 139.)  On November 2, 2020, Plaintiff sent Chabot an email requesting an extension for his leave of absence "[a]t least until the new year."  (*Id*. ¶¶ 140–42.)  On November 12, 2020, Chabot responded and informed Plaintiff that his request for extended leave was not approved and that his status in HR would be changed to "Resigned" as of November 13, 2020.  (*Id*. ¶ 143.)  The email stated that Plaintiff was "welcome to apply with the agency again once [his] situation improve[d]."  (*Id*.)  Plaintiff never returned to work or reapplied for employment.  (*Id*. ¶¶ 144–45.)

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movant meets their initial burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts, *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

### I.    Title VII Claim

An employer may not discriminate against an employee because the employee has "opposed any practice made an unlawful employment practice," or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a); *see also McMenemy v. City of Rochester*, 241 F.3d 279, 282 (2d Cir. 2001). On a motion for summary judgment, retaliation claims are analyzed under the

7

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which

as a threshold matter requires that the plaintiff establish a *prima facie* case of retaliation.  *See*

*Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  To meet this burden, the plaintiff must

demonstrate that: (1) he participated in a protected activity; (2) the defendant knew of the

protected activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a

causal connection between the protected activity and adverse employment action.  *See id*. at 166

(citing *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 173 (2d Cir. 2005)).

### A.  Protected Activity

To establish that activity is protected under Title VII, a plaintiff is "required to have had a

good faith, reasonable belief that he was opposing an employment practice made unlawful by

Title VII."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14

(2d Cir. 2013).  That is, the plaintiff need not prove that his discrimination complaint constituted

an actual violation of Title VII, but must still demonstrate that he was "acting under a good faith,

reasonable belief that a violation existed."  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d

Cir. 1990) (citations omitted).  Notably, the "reasonableness of the plaintiff's belief is to be

assessed in light of the totality of the circumstances."  *Galdieri-Ambrosini v. Nat'l Realty & Dev.*

*Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (citation omitted).

Here, Plaintiff asserts that at least six instances of protected activity form the basis of his

Title VII claim.  He identifies those activities as follows:

1.  On May 26, 2019, Plaintiff reported to Bailey that Palmer-Windley had sexually harassed him on two occasions, using the phrases "suck my dick" and "get off my dick";

2.  Between June and July of 2019, Plaintiff repeatedly asked for a schedule change, or for "something to be done" about Palmer-Windley, because she "kept harassing and teasing" Plaintiff about his reporting of the incidents;

3.  On October 10, 2019, Plaintiff filed an EEOC Charge of Discrimination, alleging gender sexual harassment, and retaliation";

4.  On March 27, 2020, Plaintiff filed a federal lawsuit in this Court, alleging "gender sexual harassment and retaliation";

5.  On October 9, 2020, Plaintiff amended his complaint in this action to reflect allegations of "retaliatory birddogging and monitoring, a retaliatory unpaid suspension, and document deletion and spoliation"; and

6.  On November 12, 2020, Plaintiff purportedly appeared before a Magistrate Judge to discuss the new allegations in his amended complaint.

(*See* Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Opp'n Mem.") at 18–21, ECF No. 38.) Defendant does not dispute that Plaintiff's October 10, 2019 EEOC Charge, the March 27, 2020 filing of his initial complaint, and the October 9, 2020 filing of his amended complaint each constitute protected activity under Title VII.  (*See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 11, ECF No. 37.)  It argues, however, that Plaintiff's other activities do not.  (*See id.*) The Court agrees.

It is well established that protected activity under Title VII is not limited to the filing of a formal discrimination complaint.  *See Ellis v. Century 21 Dept. Stores*, 975 F. Supp. 2d 244, 281 (E.D.N.Y. 2013) (collecting cases).  Rather, protection may also extend to informal activity, such as complaining to supervisors, writing critical letters, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.  *See id; Sumner*, 899 F.2d at 209.  With that said, it bears emphasizing that activity is protected only where it is "related to discrimination on a basis prohibited by Title VII."  *Bennett v. Hofstra University*, 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012).  In contrast, Title VII does not protect generalized activity, such that the employer could not have reasonably understood the plaintiff to be complaining of prohibited conduct.  *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011).

9

Against this legal backdrop, the Court cannot conclude that Plaintiff engaged in protected activity when he reported Palmer-Windley's conduct on May 26, 2019, when he voiced his scheduling concerns in June and July 2019, or with respect to the November 12, 2020 court appearance. *First*, Plaintiff's argument that his May 26, 2019 reporting of Palmer-Windley's conduct was "on its face" a complaint of sexual harassment proves too much. (*See* Pl.'s Opp'n Mem. at 9.) There is no dispute that Plaintiff complained that Palmer-Windley told him to "suck [her] dick" and "get off [her] dick." (Pl.'s Opp'n 56.1 ¶¶ 49, 52.) But, "[m]ost unfortunately, expressions such as 'fuck me,' 'kiss my ass,' and 'suck my dick,' are commonplace in certain circles, and more often than not, when these expressions are used, . . . their use has no connection whatsoever with the sexual acts to which they make reference[.]" *See generally Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997). In context, it is plainly apparent that such was the case here.

Certainly, the record indicates that Plaintiff felt "disrespected" by what Palmer-Windley said to him. (Pl.'s Opp'n 56.1 ¶ 70.) But, this is not enough, particularly where Palmer-Windley's remarks came after a prolonged period of interpersonal conflict with Plaintiff. *See Stepheny v. Brooklyn Hebrew School for Special Children*, 356 F. Supp. 3d 248, 266–67 (E.D.N.Y. 2005) (finding no protected activity where co-worker's alleged harassment of plaintiff arose "because of [plaintiff's] failed relationship with [the co-worker], and not because of [plaintiff's] gender.") As Plaintiff admits, he issued Palmer-Windley twelve separate Notices for Improvement over a six-month period in 2018. (Pl.'s Opp'n 56.1 ¶ 36.) Furthermore, he does not dispute that Palmer-Windley's utterances—specifically, "get off my dick" and "suck my dick"—came after he made at least one unprovoked joke at her expense. (*Id.* ¶¶ 44–45.) And, tellingly, Plaintiff's complaint to Bailey gave no indication that he believed his dispute with

10

Palmer-Windley to be a potential violation of Title VII.  *See Galdieri-Ambrosini*, 136 F.3d at 292 (finding no protected activity where "there [is] nothing in [the] protests that could reasonably have led [the employer] to understand that [gender] was the nature of [the] objections.")  Given Plaintiff's history with Palmer-Windley, and the discrete circumstances surrounding his interactions with Palmer-Windley leading up to May 26, 2019, Plaintiff has not demonstrated a good-faith belief that her comments, however crass, were aimed at his gender when he complained about her conduct.

*Second*, Plaintiff's suggests that his scheduling concerns in June and July of 2019 constitute protected activity, given that he "kept asking for a schedule change or something to be done because Diamond Palmer-[Windley] kept harassing and teasing him about reporting the incidents." (Pl.'s Opp'n Mem. at 19.)  However, because Plaintiff fails to link the incidents of May 25 and 26, 2019 to a perceived violation of Title VII, he cannot establish, without more, that he also perceived Palmer-Windley's subsequent "teasing" about these incidents to be violative of Title VII.  And, separately, while Plaintiff asserts that Palmer-Windley "kept harassing and teasing him" throughout June and July of 2019, (*id.*), this contention is belied by his admission that Palmer-Windley "never made any offensive comments" to him following their June 5, 2019 meeting.  (*See* Pl.'s Opp'n 56.1 ¶ 88.)  The scheduling concerns that Plaintiff purports to have raised throughout June and July of 2019 are not protected activity.

*Third*, Plaintiff's inclusion of the November 12, 2020 court appearance is, quite simply, baffling.  Again, the filing of the October 9, 2020 amended complaint has been deemed a protected activity.  However, Plaintiff cannot be said to have engaged in additional protected activity each time the court required the parties to appear at any one of the various proceedings

attendant to the prosecution of his claims.  Indeed, the Court cannot help but note that Plaintiff did not even attend the court hearing in question.[2]

Accordingly, Plaintiff's May 26, 2019 reporting of Palmer-Windley, his June and July 2019 scheduling concerns, and the November 12, 2020 court appearance cannot serve as predicate protected activity for the purpose of establishing a *prima facie* retaliation case.

### C.  Adverse Employment Action and Causation

In Title VII retaliation cases, an adverse employment action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  The inquiry is context-specific, and must consider "[the] constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *White*, 548 U.S. at 69.  "Ultimately, because 'Title VII retaliation claims must be prove[n] according to traditional principals of but-for causation,' the plaintiff must show 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"  *Flanagan v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-5246, 2014 WL 4905124, at *10 (E.D.N.Y. Sept. 30, 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)).

Plaintiff maintains that he suffered the following adverse employment actions:

1. In June 2019, he was required to sign the June 5, 2019 Agreement;

2. In July or August 2019, he was assigned to work shifts that "mirror[ed]" Palmer-Windley's schedule;

---

[2] Plaintiff attempts to avoid stating the obvious by positing that he "participated" in the November 12, 2020 hearing "by and through his undersigned counsel."  (Pl.'s Opp'n Mem. at 12.)

    3.   Between June and September 2020, he was "birddogged" and strictly monitored by Santos, Johnson, and Sarkissian; [3]

    4.   Between September 8 and September 24, 2020, he was issued at least five Notices for Improvement;

    5.   On October 2, 2020, his employment was suspended by Defendant;

    6.   On November 12, 2020, his employment was terminated by Defendant.

(Pl.'s Opp'n Mem. at 13–18.)

According to Plaintiff, the Court should infer that the six protected activities in which he engaged caused the adverse employment actions he suffered, on the basis of temporal proximity. (*See id.* at 18.)  But, as explained above, Plaintiff did not engage in any legally cognizable protected activity until he filed the October 10, 2019 EEOC Charge.  As such, the execution of the June 5, 2019 Agreement, and his work assignments mirroring those of Palmer-Windley in July or August 2019—all of which occurred before the October 10, 2019 EEOC Charge—cannot have resulted from protected activity, and therefore do not sustain his *prima facie* case.  With that said, it is not disputed that there are purported adverse employment actions that occurred following the October 10, 2019 EEOC Charge: (1) the June through September 2020 birddogging; (2) the Notices for Improvement issued to Plaintiff, beginning September 8, 2020; (3) Plaintiff's October 2, 2020 suspension; and (4) Plaintiff's November 12, 2020 termination.[4] Nevertheless, many of these adverse employment actions lack the causal connection to the protected activity necessary to sustain Plaintiff's claim.

---

[3] Although Plaintiff does not define the term "birddogging," the Court generally understands it to mean the act of "hound[ing] or pursu[ing] something or someone with a usually malicious intent."  *See* "Bird dogging," Urban Dictionary (Mar. 29, 2023), https://www.urbandictionary.com/define.php?term=bird dogging.

[4] The Court assumes for the sake of argument that these are, in fact, adverse employment actions.

Plaintiff, hoping to persuade the Court to infer causation from temporal proximity, correctly notes that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). At the same time, however, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow an inference of causation." *Maxton v. Underwriter Laboratories, Inc.*, 4 F. Supp. 3d 534, 547 (E.D.N.Y. 2014) (collecting cases). Ultimately, it is for the Court to "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

Plaintiff asserts that a temporal proximity of up to eight months can suggest a causal relationship between a protected activity and a subsequent adverse employment action. (*See* Pl.'s Opp'n Mem. at 18.) To be sure, courts have drawn inferences of causation from a temporal proximity of six months or more when there is a reason to do so. *See, e.g., Espinal*, 558 F.3d at 129 (inferring causation after six months where it was plausible that corrections officers could have "waited to exact their retaliation at an opportune time—as when [plaintiff] was involved in a fight with another inmate—in order to have a ready explanation for any injuries suffered by [plaintiff]"); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir. 1980) (inferring causation from an eight-month lapse, during which plaintiff was away on an extended work assignment, and defendant failed to show legitimate justification for the adverse employment action). But, here, Plaintiff fails to articulate a basis for the Court to deviate from the standard in this Circuit—which, again, is that a temporal proximity of "more than a few months is generally

14

too long" to infer causation absent some other evidence of retaliation. *Wilson v. New York & Presbyterian Hosp.*, No. 21-CV-1971, 2022 WL 17587564, *2 (2d Cir. Dec. 13, 2022) (summary order) (distinguishing *Grant* to conclude that eight-month lapse between protected activity and termination required plaintiff to offer "something more to link the two"); *Dixon v. International Federation of Accountants*, 416 F. App'x 107, 110–111 (2d Cir. 2001) (finding that a four-month gap between plaintiff's discrimination complaint and termination, standing alone, was insufficient circumstantial evidence of causation.)

Here, Plaintiff's first protected activity was his filing of the October 10, 2019 EEOC Charge.  The first adverse employment action to follow that activity occurred sometime in June 2020, when Plaintiff maintains three dispatch supervisors began "birddogging" him.  (Pl.'s Opp'n Mem. at 20.)  This is an eight-month gap, which even under the most generous standard is far too attenuated to imply causation.  This is particularly true where Plaintiff fails to provide any other indicia of retaliation occurring between October 10, 2019 and June 2020.  Accordingly, the October 10, 2019 EEOC Charge does not assist Plaintiff's in establishing his *prima facie* case.

The Court now turns to the next protected activity in the sequence:  the filing of Plaintiff's March 27, 2020 complaint.  It is undisputed that Plaintiff engaged in a protected activity when he filed his initial complaint on March 27, 2020.  (Def.'s Mem. at 11.)  Plaintiff did not engage in another protected activity until October 9, 2020, when he filed his amended complaint.  (Pl.'s Opp'n Mem. at 20.)  In the interim, according to Plaintiff, he sustained multiple adverse employment actions:  (1) the "birddogging" that began in June 2020; (2) the Notices for Improvement issued in September 2020; and (3) his suspension on October 2, 2020.  (*Id*.)  At best, therefore, Plaintiff alleges a six-month-lapse between the filing of his March 27, 2020 complaint and his October 2, 2020 suspension; a five-and-a-half-month lapse between the

15

filing of his March 27, 2020 complaint and receiving his first Notice for Improvement on
September 8, 2020; and a three-month lapse between his March 27, 2020 complaint filing and
the "birddogging" that began in June 2020.

Of these, only the purported birddogging of Plaintiff falls within the three-month
temporal scope sufficient to imply causation.  However, as Plaintiff acknowledges, two of the
three supervisors he accuses of this conduct—namely, Santos and Johnson—were hired after
Palmer-Windley had already resigned.  (Pl.'s Opp'n 56.1 ¶¶ 95, 116.)  Plaintiff also admits that
neither Santos nor Johnson knew who Palmer-Windley was at the time, and that neither Santos
nor Johnson received instructions to closely monitor him.  (*Id.* ¶¶ 97, 99, 117, 119.)
Furthermore, Plaintiff does not dispute that all three supervisors he accuses of retaliatory
conduct—namely, Santos, Johnson, and Sarkissian—were unaware of any complaints that
Plaintiff had previously made to Defendant concerning Palmer-Windley.  (*Id.* ¶¶ 98, 118, 124.)
Consequently, even though Plaintiff meets the temporal threshold to imply the requisite
causation between his March 27, 2020 complaint filing and the first instances of birddogging, he
fails to make a showing that his supervisors were aware of his protected activity.  Therefore, he
does not establish a *prima facie* case with respect to the June 2020 birddogging, the September
2020 Notices for Improvement, or his October 2, 2020 suspension.

Defendant concedes, however, that the one-month gap between Plaintiff's October 9,
2020 filing of the amended complaint, and his November 12, 2020 termination, is sufficient to
establish a causal connection between the two events.  Accordingly, the only potentially
actionable Title VII claim remaining is Plaintiff's termination.

**D.  Legitimate, Non-Retaliatory Reason**

16

Once a plaintiff has made a *prima facie* case, a presumption of retaliation is created. *Hicks*, 593 F.3d at 164.  However, this presumption may be rebutted by a defendant that adduces evidence of a legitimate, non-retaliatory reason for the adverse employment action.  *Id*. Importantly, "the defendant need not persuade the court that it was actually motivated by the proffered reasons [because] . . . it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it [retaliated] against the plaintiff."  *Flanagan*, 2014 WL 4905124, at *9 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)).  Finally, once a defendant establishes a legitimate, non-retaliatory reason, the presumption of retaliation dissipates, and the burden shifts back to the plaintiff to prove that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause."  *Hicks*, 593 F.3d at 164 (quoting *Sumner*, 899 F.2d at 209).  Temporal proximity alone is insufficient to show that Defendant's non-retaliatory reasons were pretextual.  *See Trane v. Northrop Grumman Corp.*, 94 F. Supp. 3d 367, 381 (E.D.N.Y. 2015) (granting summary judgment on retaliation claim, reasoning that temporal proximity alone failed to support pretext).

Here, Defendant has met its burden of persuasion in articulating a legitimate, non-discriminatory reason for Plaintiff's termination.  Specifically, the record demonstrates that Defendant had a "Voluntary Termination" policy, under which it would consider an employee to have voluntarily terminated his employment upon failing to return as scheduled from a leave of absence.  (Pl.'s Opp'n 56.1 ¶ 139.)

Plaintiff argues that the mere existence of the Voluntary Termination policy is insufficient to carry Defendant's burden of establishing a legitimate, non-retaliatory motive for his termination.  (*See* Pl.'s Opp'n. Mem. at 22.)  Referring the Court to *Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006), Plaintiff suggests that Defendant also must show that it enforced the

17

policy "reasonabl[y] and appropriate[ly] under the circumstances." (Pl.'s Opp'n Mem. at 22.) But, Plaintiff misapprehends *Leavitt*. There, the Second Circuit held that the reasonable enforcement of a preexisting disciplinary policy does not cause a materially adverse change in the terms and conditions of employment—meaning that it does not constitute an adverse employment action in the first instance. *See Leavitt*, 456 F.3d at 91. Here, Defendant has conceded that Plaintiff's termination was an adverse employment action, and simply asserts that there was a legitimate, non-retaliatory reason for taking it. Accordingly, *Leavitt* does not control.

With that said, even if the Court were to accept Plaintiff's contention that *Leavitt* is instructive, ultimately there is nothing unreasonable about the manner in which Defendant applied its termination policy. As Plaintiff concedes, he knew that he was due to return to work on November 8, 2020. (Pl.'s Opp'n 56.1 ¶ 137.) Plaintiff also acknowledges, hypothetically, that if an employee "was supposed to return on November 8, 2020, but he no-called-no showed, then [Defendant] would be ordinarily and reasonably enforcing the terms of its employee handbook concerning voluntary terminations." (Pl.'s Opp'n Mem. at 23.) This is effectively what Plaintiff did. Plaintiff last communicated with Defendant on November 4, 2020, when he expressed a desire to extend his leave of absence into the New Year. (Pl.'s Opp'n 56.1 ¶¶ 141–142.) Despite failing to confirm with Defendant that his leave extension was approved, Plaintiff did not return to work as agreed on November 8, 2020, or thereafter. Four days later, on November 12, 2020, Defendant—in keeping with its policy that an employee who missed three consecutively scheduled workdays without calling in would be voluntarily terminated—alerted Plaintiff that his employment status would be changed to "Resigned." (*Id.* ¶¶ 139, 143–144.) Plaintiff's termination was thus plainly reasonable under Defendant's policy in two respects: (1)

he did not return from leave as scheduled, and (2) he failed to either report to work or call in for three or more consecutively scheduled workdays.[5]  (*See id.* ¶ 139.)

Moreover, even if Plaintiff had returned to work following his leave of absence, his poor work performance provides an independent basis for his termination.  Indeed, the record demonstrates that Plaintiff had extensive performance issues when employed by Defendant.  (*Id.* ¶¶ 105–32.)  He was insubordinate to his supervisors, failed to investigate a water leak, and, critically, failed to report information to his supervisors concerning significant security incidents—including one in which Plaintiff was a "witness[] to a possible crime."  (*Id.*)

Tellingly, Plaintiff makes no effort to address these performance issues.  Instead, he merely posits hypothetical questions inviting the Court to speculate as to what Defendant's motives could have been.  (Pl.'s Opp'n Mem. at 24–25.)  But, it is not the Court's burden to answer those questions; it is Plaintiff's.  And, as Defendant correctly argues, Title VII "do[es] not empower [courts] to second-guess the wisdom of a business's discretionary employment decisions based on its nondiscriminatory evaluations of employee conduct." *Carter v. Autozoners, LLC*, 807 F. App'x 131, 133 (2d Cir. 2020).

Simply put, Defendant's policy was clear that failing to return would result in Plaintiff's voluntary resignation.  Plaintiff failed to return.  Defendant cited Plaintiff multiple times for poor job performance, which Plaintiff does not refute.  Each set of circumstances constitutes a

---

[5] Perhaps in an effort to overcome this unfavorable fact, Plaintiff makes the unsupported argument that "[i]t is undisputed that [Plaintiff] was not *scheduled* to work from November 8, 2020 until the date of the forced-resignation decision on November 12, 2020, so section (3) [of the Voluntary Termination policy] is irrelevant." (Pl.'s Opp'n Mem. at 22) (emphasis in original.)  What Plaintiff neglects to mention, however, is that Defendant had no opportunity to dispute this assertion in the first instance, because Plaintiff raises it for the first time in his opposition brief.  As this "undisputed" fact appears nowhere in the parties' Rule 56.1 statements, the Court will not consider it.

legitimate, non-retaliatory reason for Plaintiff's termination.  Accordingly, Defendant's motion for summary judgment as to Plaintiff's Title VII claim is granted.[6]

## III.    Supplemental Jurisdiction

Having dismissed Plaintiff's Title VII claim, the Court declines to exercise jurisdiction over Plaintiff's claims under the NYCHRL.  To be certain, "the dismissal of state law claims is not required when the federal claims in an action are dismissed."  *Reid ex rel. Roz B. v. Freeport Public Sch. Dist.*, 89 F. Supp. 3d 450, 460 (E.D.N.Y. 2015) (quoting *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 237 (E.D.N.Y. 2015)).  Instead, the Court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction' over pendent state law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). That said, "[o]nce all federal claims have been dismissed, the balance of factors will 'usual[ly]' point toward a declination" of supplemental jurisdiction.  *Lundy v. Catholic Health Sys. of Long Island*, 711 F.3d 106, 118 (2d Cir. 2013) (citation omitted).  They do here.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

SO ORDERED.

Dated: Brooklyn, New York          /s/ LDH
     March 31, 2023          LASHANN DEARCY HALL
                            United States District Judge

---

[6] Plaintiff's reliance on *Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000) is misplaced.  There, the Second Circuit affirmed a grant of summary judgment against a plaintiff, finding that the plaintiff's "claim that the Princeton Laboratory's test result was a pretext for a discriminatory discharge does not raise a triable issue of fact." *Id.* at 44.